UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | NO. 16-32 |
| LOUIS AGE JR.<br>LOUIS AGE III<br>    a/k/a "Big Lou"<br>RONALD WILSON JR.<br>KENDRICK JOHNSON<br>STANTON GUILLORY<br>    a/k/a "Nan Nan" | SECTION: M (1) |

**ORDER & REASONS**

Before the Court is a motion by defendant Kendrick Johnson to sever his case from that of co-defendant Stanton Guillory.[1] The government responds in opposition,[2] and Johnson replies in further support of the motion.[3] Also before the Court is Johnson's motion to dismiss or compel election of multiplicitous counts.[4] The government responds in opposition.[5] Considering the parties' memoranda, the record, and the applicable law, the Court denies both motions.

**I.   BACKGROUND**

On August 17, 2017, the grand jury in the United States District Court for the Eastern District of Louisiana returned a superseding indictment in this case charging five co-defendants, Louis Age Jr., Louis Age III, Ronald Wilson Jr., Johnson, and Guillory, with various counts

---

[1] R. Doc. 280.
[2] R. Doc. 311.
[3] R. Doc. 332.
[4] R. Doc. 283.
[5] R. Doc. 306.

arising from the July 27, 2012 murder of Milton Womack.[6]  Womack was a co-defendant in a Medicare fraud case filed in the United States District Court for the Middle District of Louisiana ("MDLA"), and styled *United States v. Louis T. Age, Jr. et al.*, Criminal Action No. 11-105. Womack was murdered two days after documents were filed in that case indicating that he was changing his plea to guilty.  The government's theory of this case is that the co-defendants herein conspired to murder Womack in retaliation for his past cooperation in the Medicare fraud case and to prevent him from testifying at the trial in that matter.

Johnson was not a defendant in the Medicare fraud case.  Johnson is the former son-in-law of Age Jr., and former brother-in-law of Age III.[7]  The government contends that the investigation of Womack's murder uncovered the following relevant facts: (1) Age Jr., Age III, and Johnson threatened another witness in the Medicare fraud case; (2) Age Jr. planned the murder for hire of Womack to prevent Womack from aiding law enforcement; (3) Age III and Wilson advertised among members of the Young Mafia Fellas ("YMF") gang that Age III would pay thousands of dollars for Womack's murder; (4) Wilson hired Guillory, a member of the YMF and 110ers gangs, to commit the murder; (5) Guillory accepted the murder contract and consulted with the co-conspirators charged in this indictment; (6) Age III, Wilson, and Johnson conducted surveillance to locate Womack for Guillory; (7) Age III showed Guillory and other gang members where Womack was located and paid part of the promised amount to Guillory both before and after the murder; and (8) Wilson approached Age Jr. when Age III failed to pay

---

[6] R. Doc. 52.
[7] R. Doc. 311 at 2.

Guillory in full once the murder occurred.[8] Further, the government contends that Johnson lied to the grand jury about his knowledge of the conspiracy to kill Womack.[9]

Johnson was named in nine counts of the pending indictment. Count 1 charges Johnson and his co-defendants with conspiring to commit murder for hire, in violation of 18 U.S.C. § 1958. Count 2 charges Johnson and his co-defendants with using a facility of interstate commerce (a cell phone) to commit murder for hire, in violation of 18 U.S.C. §§ 1958 and 2. In Count 3, Johnson and his co-defendants are charged with conspiring to murder Womack to prevent him from testifying in the Medicare fraud case, in violation of 18 U.S.C. §§ 1512(a)(3)(A) and 1512(k). Count 4 charges Johnson and his co-defendants with killing Womack to prevent him from testifying in the Medicare fraud case, in violation of 18 U.S.C. §§ 1512(a)(1)(A), 1512(a)(3)(A), and 2. In Count 6, Johnson and his co-defendants are charged with conspiring to murder Womack in retaliation for his cooperation with law enforcement, in violation of 18 U.S.C. §§ 1513(a)(2)(A) and 1513(f). Count 7 charges Johnson and his co-defendants with killing Womack in retaliation for his cooperation with law enforcement, in violation of 18 U.S.C. §§ 1513(a)(1)(B), 1513(a)(2)(A), and 2. Count 8 charges Johnson, Age Jr., and Age III with conspiring to use intimidation, threats, and corrupt persuasion to influence, delay, or prevent testimony in the Medicare fraud case and hindering, delaying, and preventing further communication with law enforcement relating to the commission or possible commission of a federal offense (healthcare fraud), all in violation of 18 U.S.C. § 1512(k). In Count 9, Johnson, Age Jr., and Age III are charged with conspiring to retaliate against a witness for aiding law enforcement in the Medicare fraud case, in violation of 18 U.S.C. § 1513(f). Count 10

---

[8] *Id.* at 3-4.
[9] *Id.* at 4.

3

charges Johnson with making false statements to the grand jury regarding Womack's murder, in violation of 18 U.S.C. § 1623.

## II. LAW & ANALYSIS

### A. Johnson's motion to sever

Johnson now moves to sever his trial from that of Guillory arguing that a joint trial would prejudice Johnson's right to a fair trial because the government intends to introduce evidence of Guillory's alleged gang-related activities, which would have a "spillover effect" on Johnson.[10] Johnson argues that such evidence, which includes photographs showing Guillory and other gang members brandishing weapons and flashing gang-signs or other obscene gestures and also includes reports and interviews referencing the gangs' extensive involvement in drug trafficking and numerous shootings, is inflammatory and results in a risk of severe undue prejudice to Johnson.[11] Johnson argues that such evidence is not admissible against him because there is no indication that he was involved in the YMF or 110ers or that he had any association with Guillory outside of the conduct charged in the present indictment.[12] Johnson is particularly concerned with evidence of Guillory's involvement in a shooting at a birthday party that resulted in the unintended deaths of a five-year-old girl and a mother of three.[13] Johnson argues that a limiting instruction is inadequate to protect against prejudicial spillover due to the highly emotional nature of this evidence.[14]

The government argues that a limiting instruction is sufficient to protect against spillover, and that there is no reason that Johnson should be tried separately because he is charged, along

---

[10] R. Doc. 280-1 at 5-8.
[11] *Id.* at 7.
[12] *Id.* at 6.
[13] *Id.* at 7.
[14] *Id.* at 8.

with Guillory and the other co-defendants, with multiple conspiracy counts related to a murder-for-hire plot.[15] Further, the government argues that there is no reason to assume that the jury would be so inflamed by the evidence of Guillory's involvement in other murders as to convict Johnson on an improper basis.[16]

Pursuant to Rule 8(b) of the Federal Rules of Criminal Procedure, defendants may be charged together in one indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). "There is a preference in the federal system for joint trials of defendants who are indicted together" because joint trials promote judicial efficiency and serve the interests of justice by avoiding the risk of inconsistent verdicts. *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (quoting *Richardson v. Marsh*, 481 U.S. 200, 209-10 (1987)). This is particularly true in conspiracy cases. *United States v. Ledezma-Cepeda*, 894 F.3d 686, 690 (5th Cir. 2018).

However, under Rule 14 "[i]f the joinder of offenses or defendants in an indictment … appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). "Rule 14 does not require severance even if prejudice is shown." *Zafiro*, 506 U.S. at 538-39 (citations omitted). Rather, "Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts." *Id*. at 541. "And, as a substantive matter, [the Fifth Circuit's] caselaw does not reflect a 'liberal attitude toward severance.'" *Ledezma-Cepeda*, 894 F.3d at 690 (quoting *United States v. McRae*, 702 F.3d 806, 822 (5th Cir. 2012)).

---

[15] R. Doc. 10-20.
[16] *Id.*

Severance under Rule 14 "is an *exception* warranted 'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *Id.* (quoting *Zafiro*, 506 U.S. at 539). To overcome the presumption in favor of joinder, a defendant must demonstrate that: (1) a joint trial would prejudice him to such an extent that the district court could not provide adequate protection through a limiting instruction; and (2) the prejudice would outweigh the government's interest in judicial economy. *Id.* (citation omitted). "Generic allegations of prejudice" are insufficient because "neither a quantitative disparity in the evidence nor the presence of a spillover effect requires severance." *Id.* (citations omitted). Moreover, in conspiracy cases, courts "generally favor specific instructions over severance … because it is generally presumed that juries follow the instructions given to them by the district court and are capable of compartmentalizing the evidence against each defendant." *Id.* (internal quotation marks, alterations, and citations omitted).

Johnson argues that *United States v. Cortinas*, 142 F.3d 242 (5th Cir. 1998), stands for the proposition that severance is required "where the [g]overnment seeks to introduce prejudicial and inflammatory evidence of violent gang activity that is otherwise unrelated [to] the co-defendant's alleged involvement in a conspiracy."[17] This is too broad a reading of *Cortinas*, which instead concluded that severance was warranted under the specific and distinguishable facts of that case.

*Cortinas* involved a conspiracy to distribute marijuana that was distinctly divided into two phases, pre- and post-1989. *Id.* at 246, 248. From 1984 to 1989, Daniel Nieto, the leader of the smuggling organization, bought marijuana from Arturo Villareal and stored it at Metro

---

[17] R. Doc. 280-1 at 6.

Transmissions, his place of business in San Antonio, Texas. *Id.* at 246. Villareal's uncle, Ricardo Rodriguez, delivered the marijuana to Metro Transmissions, and on several occasions, Villareal's sister, Linda Rodriguez Mata, received the payment for the marijuana. *Id.* In 1989, Nieto found another source of marijuana, thus ending the involvement of Villareal, Rodriguez, and Mata in the conspiracy. *Id.*

Thereafter, Daniel and Henry Villegas became involved in the conspiracy. *Id.* Both Villegases were members of the Southside Bikers Club ("Southsiders"), which was an offshoot of the Bandido National Motorcycle Club ("Bandido"). *Id.* When Nieto encountered problems collecting from some customers in Michigan, he enlisted the services of Ernest Cortinas, a small-time customer, and other members of the Bandido's San Antonio chapter to aid in the collection efforts. *Id.* As a result, in September 1991, Cortinas and other Bandido members "shot up" the home of a delinquent debtor, which resulted in the death of a 14-year-old boy. *Id.*

Before trial, Rodriguez, Mata, and Daniel and Henry Villegas all filed Rule 14 severance motions arguing that evidence of the Bandido gang's activities was irrelevant and highly prejudicial to their cases as to undermine their rights to a fair trial. *Id.* at 248. The Fifth Circuit, while recognizing that "persons jointly indicted in a conspiracy case should generally be tried together," *id.* (quoting *United States v. Scott*, 795 F.2d 1245, 1250 (5th Cir. 1986)), concluded that the district judge erred in denying Rodriguez's and Mata's motions for severance because their involvement with Nieto ended in 1989, prior to the Bandido gang's joining the conspiracy, and the district judge's limiting instructions "were inadequate to mitigate the prejudicial effect of the overwhelming testimony regarding the violent, criminal activities of the Bandidos." *Id.* On the other hand, the Fifth Circuit affirmed the district judge's decision not to sever the Villegases' trials because they were both members of the Southsiders, which was affiliated with the Bandido

gang, and their involvement with Nieto coincided with the Bandido gang's collection efforts.  *Id.* at 249.

Here, Johnson's involvement in the alleged conspiracies coincides with Guillory's. There is no temporal distinction, as there was in *Cortinas* with respect to Rodriguez and Mata, that would disassociate Johnson's alleged involvement in the conspiracies from that of Guillory. Indeed, Johnson is alleged to have engaged in these conspiracies with the object of hiring a gang member, Guillory, to murder Womack.  Thus, Guillory's gang affiliations are relevant to both the charges and the government's case against Johnson.

The case at bar is analogous to *United States v. Ledezma-Cepeda* where the Fifth Circuit found that severance was not warranted when the co-defendants "were charged *together*, for the very *same crime*, committed at the *same time*."  894 F.3d at 692 (emphasis in original).  Jesus Ledezma-Cepeda was a private investigator and a member of the Grupo Rudo, a collection of drug-cartel members and corrupt police officers in Mexico.  *Id.* at 687.  Ledezma was friends with many members of the Beltran-Leyva Organization, a drug cartel.  *Id.* A leader of the cartel, Rodolfo Villareal-Hernandez, known as "Gato," asked Ledezma to track down Juan Guerrero-Chapa ("Chapa"), who Gato believed murdered his father.  *Id.*  Ledezma's search led him to the United States where he was helped by his cousin, Jose Cepeda-Cortez.  *Id.* at 687-88.  For several weeks, Ledezma, Cepeda, and Ledezma's son, Jesus Ledezma-Campano ("Campano"), tracked Chapa and reported back to Gato.  *Id.*  Gato eventually sent two hitmen to Texas to murder Chapa.  *Id.* at 688.  More than a year after Chapa's murder, Ledezma, Campano, and Cepeda were indicted together for interstate stalking and conspiracy to commit murder for hire. *Id.* at 688-89.

The government filed a notice under Rule 404(b) of the Federal Rules of Evidence of its

intent to use other-crimes evidence against Ledezma linking him to at least nine additional murders in five years and showing that he was tracking two other persons for the cartel at the time of his arrest. *Id.* at 689. Cepeda filed a motion to sever "arguing that the spillover effect from evidence of multiple drug cartel murders would unduly prejudice him and deny him the right to have the jury weigh only the evidence against him." *Id.* The district court denied the motion and denied it again when Cepeda renewed it during trial. *Id.* The Rule 404(b) evidence included photographs of the body of Eliseo Elizondo, whom Ledezma tracked for the cartel. *Id.* Elizondo was tortured and murdered, and the photographs showed bullet wounds, asphyxiation marks, and bruising. *Id.* The district court instructed the jury that the Rule 404(b) evidence "only can be used for determining motive, intent, that sort of thing, of the person about whom it's being spoken" and "in this case, that would be Mr. Ledezma." *Id.* Cepeda again re-urged his motion to sever at the close of the trial, and the court once again denied it. *Id.*

On appeal, the Fifth Circuit held that severance was not warranted because there was no temporal distinction between Cepeda's and Ledezma's involvement in the conspiracy. *Id.* at 691-92. Instead, they were charged with committing the same crime at the same time. *Id.* The appellate court noted that Cepeda's argument of "general 'spillover' concerns [is] precisely the type of codefendant evidence that [the court] presume[s] limiting instructions can cure." *Id.* at 692. Further, the court noted that the district court did not abuse its discretion by denying Cepeda's multiple motions to sever because it "ably parsed the evidence and instructed the jury many times to consider certain evidence only against Ledezma and only for limited purposes." *Id.* (internal quotation marks and alterations omitted).

The same is true in this case. Johnson states that evidence of Guillory's gang activities, particularly his involvement in other murders, is so inflammatory that a limiting instruction

would be inadequate to protect Johnson against prejudicial spillover and ensure Johnson's right to a fair trial.[18] This general spillover argument does not satisfy Johnson's burden to overcome the presumption for joint trials of co-defendants who are indicted together, for the *same crime*, committed at the *same time*. Johnson has not met his heavy burden of showing specific and compelling prejudice he will suffer from a joint trial with Guillory. To the extent the government introduces Rule 404(b) evidence against Guillory, this Court will issue an appropriate limiting instruction with respect to such evidence. As such, Johnson's motion to sever is denied.

### B. Johnson's motion to dismiss or compel election of multiplicitous counts

Johnson argues that Count 3 (conspiracy to murder Womack to prevent him from testifying in the Medicare fraud case in violation of 18 U.S.C. §§ 1512(a)(3)(A) and 1512(k)) and Count 6 (conspiracy to murder Womack in retaliation for his cooperation with law enforcement in violation of 18 U.S.C. §§ 1513(a)(2)(A) and 1513(f)) are multiplicitous because both charges arise from the single alleged agreement to kill Womack to obstruct justice.[19] Johnson contends that multiplicity is evident because the elements of the crimes are identical, except for the required intent – to prevent further cooperation (§ 1512) or in retaliation for past cooperation (§ 1513) – which Johnson characterizes as a "distinction without a difference" since both statutes prohibit conspiring to kill an individual for cooperating with law enforcement.[20] Johnson argues that the jury will not be able to compartmentalize the evidence of each of these crimes, which will lead to confusion, prejudice, and a double conviction.[21]

---

[18] R. Doc. 280-1 at 8.
[19] R. Doc. 283-1 at 5-8.
[20] *Id.* at 7.
[21] *Id.* at 7-8.

In opposition, the government argues that Fifth Circuit jurisprudence holds that sections 1512 and 1513 are not multiplicitous, but rather constitute two distinct crimes because they require different intent elements.[22] Further, the government argues that there is no risk of jury confusion because whether Johnson (and his co-defendants) conspired to murder Womack with the intent to *prevent future cooperation* (§ 1512), or whether they conspired to murder Womack with the intent to *retaliate for past cooperation* (§1513), are distinctly different crimes.[23]

"'Multiplicity' is charging a single offense in more than one count in an indictment." *United States v. Galvan*, 949 F.2d 777, 781 (5th Cir. 1991) (citations omitted). "The issue of multiplicity arises where … the same act or conduct constitutes a violation of two or more distinct statutory provisions." *United States v. Maggitt*, 784 F.2d 590, 599 (5th Cir. 1986). However, a single "act may violate two or more statutes and constitute independent offenses." *Id.* (citation omitted). Thus, "the fact that a defendant is charged twice in an indictment for the same conduct does not necessarily mean he is being charged with the same offense." *Id.* (citation omitted). The multiplicitous nature of charges "turns primarily on whether each charge requires proof of a different element from each other charge." *Id.* (citations omitted). There is no multiplicity "[i]f one element is required to prove the offense in one count which is not required to prove the offense in the second count." *Id.* (citations omitted).

In *United States v. Maggitt*, the Fifth Circuit, applying these principles, held that charges under sections 1512 and 1513 are not multiplicitous. *Id.* The court stated:

> Each charge is proscribed by a separate statutory provision and the facts necessary to one are not necessary to the other. For example, tampering under 18 U.S.C. § 1512 requires proof, *inter alia*, that the intended victim was to participate in a pending or future proceeding. To prove retaliation under 18 U.S.C. § 1513, in contrast, the [g]overnment must establish that the victim had given testimony

---

[22] R. Doc. 306 at 1-6.
[23] *Id.* at 6.

previously and that the defendant's acts were intended to be in retaliation for the prior testimony.

*Id.*

Further, the court observed that Congress expressed no intent, either in the wording of the statutes or elsewhere, "to preclude simultaneous prosecutions for a single act under sections 1512 and 1513." *Id.* Indeed, "[t]he chief danger raised by a multiplicious indictment is the possibility that the defendant will receive more than one sentence for a single offense." *Galvan*, 949 F.2d at 781 (internal quotation marks and citation omitted). "Each section [1512 and 1513] unambiguously authorizes punishment for a violation of its terms," and "the legislative history does not preclude cumulative punishments" under these sections. *Maggitt*, 784 F.2d at 599 (citations omitted). In sum, the Fifth Circuit unequivocally held that "[i]n these circumstances and given that each statutory provision requires proof of a fact that the other does not, separate counts charging that a single act violated both 18 U.S.C. § 1512 and 18 U.S.C. § 1513 are not multiplicious." *Id.* at 599-600 (citation omitted). Considering this binding precedent, the Court finds that Counts 3 and 6 in the indictment are not multiplicitous.

### III. CONCLUSION

Accordingly, for the reasons stated above,

IT IS ORDERED that Johnson's motion to sever (R. Doc. 280) is DENIED.

IT IS FURTHER ORDERED that Johnson's motion to dismiss or compel election of multiplicitous counts (R. Doc. 283) is DENIED.

New Orleans, Louisiana, this 27th day of January, 2020.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE